**COUNTY DEMOCRATIC EXECUTIVE COMMITTEE IN AND FOR BEXAR COUNTY et al. v. BOOKER.**

No. 9038.

Court of Civil Appeals of Texas. San Antonio.

July 28, 1932.

Dissenting Opinion July 29, 1932. Concurring Opinion Aug. 1, 1932.

See, also, 52 S.W.(2d) 908.

Templeton, Brooks, Napier & Brown, of San Antonio, for appellants.

Oscar M. Powell, of San Antonio, for interveners.

Cunningham, Moursund, Johnson, Rogers & Slatton, of San Antonio, for appellee.

S. S. SEARCY, Special Associate Justice.

C. A. Booker, appellee, brought this suit in the Forty-Fifth judicial district court of Bexar county, Tex., "for himself and others in the same class and like situation, under similar circumstances and conditions, as this plaintiff," against the county Democratic executive committee in and for Bexar county, Tex., John K. Weber, chairman of the Bexar county Democratic executive committee, C. O. Wolfe, secretary of the Bexar county Democratic executive committee in and for Bexar county, Tex., and Adolph Lassner, presiding judge of the Democratic precinct primary election, to be held on July 23, 1932, in election precinct No. 73, in the city of San Antonio, Bexar county, Tex., and their successors in office.

He alleges he is a member of the negro race, a native-born American citizen, a resident citizen of San Antonio, Bexar county, Tex., a qualified voter and elector under the Constitution and laws of the United States and the state of Texas, a member of the Democratic Party, and entitled to vote at election precinct No. 73, in San Antonio, Tex., in the primary elections, to be held July 23 and August 27, 1932; that he will be deprived of his right to vote at said primary elections by reason of the following resolution adopted by the state Democratic convention at Houston, Tex., May 24, 1932, to wit: "Be It Resolved: That all white citizens of the State, who are qualified to vote under the Constitution and laws of Texas, shall be eligible for membership in the Party and as such, eligible for participation in the primaries," in violation of his rights under the Fourteenth and Fifteenth Amendments to the Constitution of the United States. He prays for injunction, etc.

The trial court granted the injunctive relief prayed for, and the case is here on appeal to review the decree of the district court.

In Nixon v. Condon, 286 U. S. 73, 52 S. Ct. 484, 487, 76 L. Ed. 984, a similar resolution passed by the state executive committee was held to have been passed under the au-

thority of article 3107 (chapter 67, Acts 1927 [Vernon's Ann. Civ. St. art. 3107]), and the reasoning is that the State Executive Committee acted as a state agency and not as a political agency, and therefore its resolution came within the inhibitions of the Fourteenth and Fifteenth Amendments. The court said: "The pith of the matter is simply this, that, when those agencies are invested with an authority independent of the will of the association in whose name they undertake to speak, they become to that extent the organs of the state itself, the repositories of official power. They are then the governmental instruments whereby parties are organized and regulated to the end that government itself may be established or continued. What they do in that relation, they must do in submission to the mandates of equality and liberty that bind officials everywhere. They are not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions unbrokenly and smoothly." This decision, however, is expressly limited in its scope.

We are confronted with a different state of facts. The resolution complained of by appellee was adopted by the state convention of the Democratic Party in convention assembled at Houston, Tex., May 24, 1932, as its free and voluntary act, expressing the will of the Democratic Party in Texas, with respect to who shall be eligible for membership in the party, and, as such, eligible for participation in the primaries. In Nixon v. Condon, supra, the court said:

"In Nixon v. Herndon, 273 U. S. 536, 71 L. Ed. 759, 47 S. Ct. 446, decided at the October term, 1926, this court had before it a statute of the state of Texas (article 3093a, Revised Statutes * * * afterwards numbered 3107 [Vernon's Ann. Civ. St.]) whereby the Legislature had said that 'in no event shall a negro be eligible to participate in a Democratic party primary election (held in that State),' and that, 'should a negro vote in a Democratic primary election, such ballot shall be void,' and election officials were directed to throw it out. While that mandate was in force, the negro was shut out from a share in primary elections, *not in obedience to the will of the party speaking through the party organs* [italics ours], but by the command of the state itself, speaking by the voice of its chosen representatives. * * *

"We recall at this point the wording of the statute invoked by the respondents. 'Every political party in this State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party.' *Whatever inherent power a state political party has to determine the content of its membership resides in the state convention.* [Italics ours.] Bryce, Modern Democracies, vol. 2, p. 40.

"*There platforms of principles are announced and the tests of party allegiance made known to the world. What is true in that regard of parties generally is true more particularly in Texas, where the statute is explicit in committing to the state convention the formulation of the party faith (article 3139).* [Italics ours.] The state executive committee, if it is the sovereign organ of the party, is not such by virtue of any powers inherent in its being. It is, as its name imports, a committee and nothing more, a committee to be chosen by the convention and to consist of a chairman and thirty-one members, one from each senatorial district of the state (article 3139). To this committee the statute here in controversy has attempted to confide authority to determine of its own motion the requisites of party membership and in so doing to speak for the party as a whole. Never has the state convention made declaration of a will to bar negroes of the state from admission to the party ranks. Counsel for the respondents so conceded upon the hearing in this court. Whatever power of exclusion has been exercised by the members of the committee has come to them, therefore, *not as the delegates of the party, but as the delegates of the state.* [Italics ours.] * * * The most that can be said for the respondents is that the inherent powers of the committee are still unsettled in the local courts. Nothing in the state of the decisions requires us to hold that they have been settled in a manner that would be subversive of the fundamental postulates of party organization. The suggestion is offered that in default of inherent power or of statutory grant the committee may have been armed with the requisite authority by vote of the convention. Neither at our bar nor on the trial was the case presented on that theory. *At every stage of the case the assumption has been made that authority, if there was any, was either the product of the statute or was inherent in the committee under the law of its creation.*" (Italics ours.)

The Democratic Party in Texas is a voluntary political association, and, assembled in convention, has the power to determine who shall be eligible for membership in the party, and, as such, eligible for participation in the primaries. A study of the election laws of Texas and their history can lead to no other conclusion.

Nixon v. Condon, supra, was decided May 2, 1932. The state convention of the Democratic party was held at Houston, Tex., May 24, 1932. In our opinion, the adoption of the resolution complained of by appellee, by said

convention, was the expression of the will of the Democratic Party in Texas, with respect to who shall be eligible for membership in the party and as such eligible for participation in the primaries, in line with the opinion of the Supreme Court of the United States in Nixon v. Condon.

The judgment of the district court should be reversed, and the suit dismissed. It is so ordered.

FLY, C. J.

I concur in this decision.

COBBS, J.

I do not concur, but dissent, in the decision.

COBBS, J. (dissenting).

The majority of this court, speaking through Special Associate Justice SEARCY (appointed by the Governor because of the disqualification of Associate Justice SMITH) have delivered an opinion upon the questions involved in this case, and it is with some regret that I feel called upon to dissent from the conclusions reached by the majority. That regret is based upon the profound conviction that their decision is unsound, and does violence to the Fourteenth and Fifteenth Amendments to the Constitution of the United States. It is believed that the judgment and opinion of the majority is so out of harmony with the decisions of the United States Supreme Court in Nixon v. Herndon, 273 U. S. 536, 47 S. Ct. 446, 71 L. Ed. 759, and Nixon v. Condon, 286 U. S. 73, 52 S. Ct. 484, 76 L. Ed. 984, the decision of our own Supreme Court in Love v. Wilcox, 119 Tex. 256, 28 S.W.(2d) 515, 70 A. L. R. 1484, and the decision of this Court in Briscoe v. Boyle, 286 S. W. 275 (which is cited with approval by our Supreme Court in Love v. Wilcox, supra), that I feel constrained to file this dissenting opinion.

The opinion of the majority in the statement of the allegations of appellee's petition wholly fails to mention the fact that appellee alleged that on June 14, 1932, the state Democratic executive committee, acting under authority of article 3107 of the Revised Civil Statutes of Texas, by resolution, declared the resolution of the convention to be valid to deprive appellee and all other qualified voters of the Negro race similarly situated of the right to vote in the primary elections, and ordered said resolution certified to the county chairmen, and that, in obedience to the mandates of the state Democratic executive committee, the appellants were threatening to do the acts complained of by appellee. The majority fail to mention the numerous allegations in appellee's petition showing that primary elections held in this state are conducted in part at public expense, which bring

this case within the decision of the United States Circuit Court of Appeals, for the Fourth Circuit, in the case of Bliley v. West, 42 F.(2d) 101 (C. C. A. 1930), and the majority also fail to mention the fact that the position of each of the appellants herein is created by statute and that each of said appellants is vested with authority from the state. However, in the view that I take of the matter, it will not be necessary to discuss at length these omissions.

The Legislature, by enacting present article 3107, and therein providing that "every political party in this State *through its State Executive Committee* shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party" (italics mine), has designated the agency to determine the requisites of party membership and to speak for the party as a whole, and the mention of this one agency is the exclusion of other agencies. This principle of construction is recognized by our Supreme Court in Harris County v. Crooker, 112 Tex. 450, 248 S. W. 652, where the court, speaking through Mr. Chief Justice Cureton said (loc. cit. 655, of 248 S. W., 112 Tex. 450): "The rule expressio unius est exclusio alterius is a sound one, frequently applied in the construction of statutes, and is applicable here. The inclusion of the specific limitation excludes all others"—citing authorities.

This construction is also sustained by the United States Supreme Court in Nixon v. Condon, supra.

The majority, while quoting from that portion of the opinion in Nixon v. Condon, supra, where the court, speaking through Mr. Justice Cardozo, said: "Whatever power of exclusion has been exercised by the members of the committee has come to them, therefore, not as the delegates of the party, but as the delegates of the state"—but the majority omit the portion immediately following the above quotation, where the court, speaking through Mr. Justice Cardozo, further said: "*Indeed, adherence to the statute leads to the conclusion that a resolution once adopted by the committee must continue to be binding upon the judges of election though the party in convention may have sought to override it, unless the committee, yielding to the moral force of numbers, shall revoke its earlier action and obey the party will. Power so intrenched is statutory, not inherent.*" (Italics mine.)

I am therefore constrained to believe that the state convention (which passed the resolution set out in the majority opinion), held under article 3167, which is a creature of the statute and authorized by law to meet only once every four years for the purpose (prescribed by statute) of selecting delegates to

the national convention, was without authority to prescribe the qualifications of membership in the Democratic Party and of those who should participate in the Democratic Primary elections, and that whatever inherent power the Democratic Party had prior to the enactment of article 3107 to determine the content of its membership resided in the convention held under article 3139 and not in the convention held under article 3167, and that, by reason of the enactment of article 3107, such inherent power has been taken from such convention and by the state delegated exclusively to the state executive committee, and that said state executive committee, in the passage of its resolution, was necessarily acting under the power conferred upon it by article 3107, and that this action of this agency of the state is violative of the Fourteenth Amendment. Nixon v. Condon, supra.

The majority claimed support for their conclusions in the case of Nixon v. Condon, supra; but I am unable to find comfort there for those conclusions. In that case, the court, speaking through Mr. Justice Cardozo, said (286 U. S. loc. cit. 81, 52 S. Ct. 484, 76 L. Ed. 984):

"The petitioner, a negro, has brought this action against judges of election in Texas to recover damages for their refusal by reason of his race or color to permit him to cast his vote at a primary election.

"This is not the first time that he has found it necessary to invoke the jurisdiction of the federal courts in vindication of privileges secured to him by the Federal Constitution."

And the court further said (286 U. S. loc. cit. 83, 52 S. Ct. 484, 485, 76 L. Ed. 984): "Barred from voting at a primary the petitioner has been, and this for the sole reason that his color is not white. The result for him is no different from what it was when his cause was here before. The argument for the respondents is, however, that identity of result has been attained through essential diversity of method."

And the court further said (286 U. S. loc. cit. 84, 52 S. Ct. 484, 485, 76 L. Ed. 984):

"Whatever our conclusion might be if the statute had remitted to the party the untrammeled power to prescribe the qualifications of its members, *nothing of the kind was done. Instead, the statute lodged the power in a committee*, which excluded the petitioner and others of his race, not by virtue of any authority delegated by the party, but by virtue of an authority originating or supposed to originate in the mandate of the law." [Italics mine.]

"We recall at this point the wording of the statute invoked by the respondents. 'Every political party in this State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party.'"

And the court further said (286 U. S. loc. cit. 85, 52 S. Ct. 484, 486, 76 L. Ed. 984): "To this committee the statute here in controversy has attempted to confide authority to determine of its own motion the requisites of party membership and in so doing to speak for the party as a whole. Never has the state convention made declaration of a will to bar negroes of the state from admission to the party ranks. Counsel for the respondents so conceded upon the hearing in this court. Whatever power of exclusion has been exercised by the members of the committee has come to them, therefore, not as the delegates of the party, but as the delegates of the state. *Indeed, adherence to the statute leads to the conclusion that a resolution once adopted by the committee must continue to be binding upon the judges of election though the party in convention may have sought to override it, unless the committee, yielding to the moral force of numbers, shall revoke its earlier action and obey the party will. Power so intrenched is statutory, not inherent.*" (Italics mine.)

And the court further said (286 U. S. loc. cit. 88, 52 S. Ct. 484, 487, 76 L. Ed. 984):

"We do not impugn the competence of the Legislature to designate the agencies whereby the party faith shall be declared and the party discipline enforced. The pith of the matter is simply this, that, when those agencies are invested with an authority independent of the will of the association in whose name they undertake to speak, they become to that extent the organs of the state itself, the repositories of official power. They are then the governmental instruments whereby parties are organized and regulated to the end that government itself may be established or continued. What they do in that relation, they must do in submission to the mandates of equality and liberty that bind officials everywhere. They are not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions unbrokenly and smoothly. Whether in given circumstances parties or their committees are agencies of government within the Fourteenth or the Fifteenth Amendment is a question which this court will determine for itself. It is not concluded upon such an inquiry by decisions rendered elsewhere. The test is not whether the members of the executive committee are the representatives of the state in the strict sense in which an agent is the representative of his principal. The test is whether they are to be classified as repre-

sentatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action.

"With the problem thus laid bare and its essentials exposed to view, the case is seen to be ruled by Nixon v. Herndon [273 U. S. 536, 71 L. Ed. 759, 47 S. Ct. 446], supra. Delegates of the state's power have discharged their official functions in such a way as to discriminate invidiously between white citizens and black. Ex parte Virginia [100 U. S. 339, 25 L. Ed. 676, 3 Am. Crim. Rep. 547], supra; Buchanan v. Warley, 245 U. S. 60, 70, 77, 62 L. Ed. 149, 161, L. R. A. 1918C, 210, 38 S. Ct. 16, Ann. Cas. 1918A, 1201. The Fourteenth Amendment, adopted as it was with special solicitude for the equal protection of members of the Negro race, lays a duty upon the court to level by its judgment these barriers of color."

It will be noted that the Supreme Court in Nixon v. Condon, supra, held that the statute granting the power to the state executive committee to fix the qualifications of membership was a statutory grant of power, while it was the contention of the minority that this was merely a statutory recognition of inherent authority. But even the minority opinion in Nixon v. Condon, supra, concedes that the conclusions reached by the majority in the case at bar cannot find support in that opinion of the United States Supreme Court, because Mr. Justice McReynolds, speaking for the minority, in the course of his opinion, said (286 U. S. loc. cit. 103, 52 S. Ct. 484, 493, 76 L. Ed. 984): "If statutory recognition of the authority of a political party through its executive committee to determine who shall participate therein gives to the resolves of such party or committee the character and effect of action by the state, of course the same rule must apply when party conventions are so treated," etc.

The majority, in their opinion in the case at bar, say: "The Democratic Party in Texas is a voluntary Political Association and, assembled in convention, has the power to determine who shall be eligible for membership in the party, and as such, eligible for participation in the primaries. A study of the election laws of Texas and their history can lead to no other conclusion."

In the case of Briscoe v. Boyle, supra, this court considered at length the legislative situation with respect to primary elections, and held that, since the state of Texas had legislated in detail concerning the qualifications of voters at such elections, the political parties themselves no longer had any power to prescribe qualifications not made under authority of statute, and, while there are expressions in the opinion not necessary to the decision, and not material now, which are not in accord with the later case of Nixon v. Herndon, supra, yet I believe what we held there to be applicable here, and contrary to the aforementioned conclusions of the majority, for we there said (loc. cit. 276 of 286 S. W.):

"Before the legislative department invaded the province of party government, and assumed control and regulation of party machinery, the right to say who should and who should not participate in party affairs was exercised by the party governments, with which the courts would not concern themselves.

"But the Legislature has taken possession and control of the machinery of the political parties of the state, and, while it permits the parties to operate that machinery they do so only in somewhat strict accordance with the rules and regulations laid down in minute and cumbersome detail by the legislative body. The statute designates the official positions to be occupied in the parties, and, while it permits the members of the parties to select such officials, they can do so only in the manner prescribed by the statutes, which define the powers and duties of those officials, beyond which they cannot lawfully act. The statute prescribes the time, place, and manner of holding primary elections. It prescribes the forms of the ballots to be used, and the process by which the election officials shall identify and hand out the ballots and by which the voters shall mark and deposit the ballots when voted. It prescribes the declaration to be made by the voter, and the obligation to be assumed by him as a condition precedent to the validity of his ballot. In fine, the Legislature has in minute detail laid out the process by which political parties shall operate the statute-made machinery for making party nominations, and has so hedged this machinery with statutory regulations and restrictions as to deprive the parties and their managers of all discretion in the manipulation of that machinery. * * *

"By excluding negroes from participating in party primary elections, and by legislating upon the subject of the character and degree of party fealty required of voters participating in such elections, the Legislature has assumed control of that subject to the exclusion of party action, thus depriving the party of any power to alter, restrict or enlarge the test of the right of the voter to participate in party primaries." (Italics mine.)

I am of the opinion that, in view of the recent pronouncements of the United States Supreme Court and our primary election laws and the decisions of the courts of our state construing the same, particularly our own decision in Briscoe v. Boyle, supra, the state executive committee, the state convention, and each of the appellants herein are to be classified as representatives of the state to such an extent and in such a sense that the restraints of the Constitution set limits to

their action, and that the threatened acts of each of the appellants are in violation of appellee's rights guaranteed to him under the Fourteenth Amendment to the Constitution of the United States, and in violation of the federal penal statutes enacted pursuant thereto, and that the trial court did not err or abuse his discretion in granting the injunction prayed for, and that the judgment of the trial court should be in all things affirmed. Nixon v. Condon, supra; Nixon v. Herndon, supra; Raymond v. Chicago Union Traction Co., 207 U. S. 20, 28 S. Ct. 7, 52 L. Ed. 78, 79, 87, 12 Ann. Cas. 757; Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U. S. 278, 33 S. Ct. 312, 57 L. Ed. 510, 515; Yick Wo v. Hopkins, 118 U. S. 356, 373, 6 S. Ct. 1064, 30 L. Ed. 220.

I cannot agree with my brethren in the conclusions they have reached, and therefore dissent.

FLY, C. J.

In all popular governments it has always been conceded that the liberty of the people could only be preserved through the undisturbed right of the citizens to assemble and give expression to their views as to the proper conduct of governmental affairs, to give voice to their grievances and suggest changes in the administration of the government and advocate principles necessary to protect the rights of the people. The Americans inherited their principle of the voice of the people being uttered through the medium of assemblies for that purpose, and, while assuming this right before the adoption of the Federal Constitution, our forefathers deemed the right of citizens to meet in assemblages or conventions so important that it was written into the Constitution, and became a cardinal point in the Bill of Rights of the organic law of the land. Out of the right so secured by the Constitution, political parties came by natural and inevitable evolution. In the convention held for the purpose of framing a constitution, the difference in theories of government came rapidly to the surface, and the seeds of different political parties germinated and came into active existence, and a cleavage of ideas as to what would constitute a government of the people became so marked and antagonistic that it was apparent that it was necessary that those believing in local self-government and those who believed in a strong central government could not live together in unity, and the contest was on that will exist as long as there is a semblance of liberty in America. The antagonistic principles and theories of government found expression in convention of those of like faith, who held conventions, wrote their principles, and indorsed those they desired to elect to carry out the views of their constituencies. The party of Jefferson holding to the theory of local self-government was organized in the early days of the republic, and has existed through the vicissitudes and political contests of more than one hundred years. The opposing school of politics has also existed during that time, sometimes under the name of Federals, Whigs, or Republicans, but at all times adhering to the Hamiltonian theory of a strong centralized government at the expense of state rights and local self-government. Parties to formulate and execute the two diverse theories of government have kept up their organizations without interference until within the last forty or fifty years, when the state has in many ways sought to invade the rights of the people as expressed through their party organizations. The invasion has been pressed through constitutional amendments, the Congress, federal courts, and the machinery of the judiciary department of the federal government. The primary system has been adopted in a number of the states, and that system has opened a fertile field for legislation seeking to destroy the freedom of choice and action on the part of political parties. The onslaught on political parties has culminated in courts usurping most of their prerogatives, and at last the political party is enjoined from selecting its own membership, and labored opinions are delivered to demonstrate that the party is a mere agency of government and has even lost the right of deciding who shall be eligible to participate in its actions.

The Fourteenth and Fifteenth Amendments of the Constitution, submitted and adopted by a portion of the states of the United States, have been interpreted so as to cover almost every phase of life, at least in the Southern section of the republic. The object and aim of those responsible for the formation and presentation of the amendments were primarily to transform the former slave into a full-fledged citizen, and invest him with all the rights and privileges of the highest position on earth, that of a voter under the Constitution. No one would so stultify himself as to claim that it was contemplated by those who formulated the two amendments to obliterate all control of the people over their political parties, and especially open wide the doors of the Democratic Party to all negroes who might desire to enter therein. On the other hand, the negroes were taught to avoid that party as they would a pestilence, and to homologate and associate alone with the "Grand Old Party." The creators of the two amendments would have been horrified at the thought of a negro entering Democratic councils. The amendments were undoubtedly only intended to protect the negro in his right of suffrage at elections for choosing the officials of government, national and state. One of the rules for the proper interpretation of an amendment or a statute is to endeavor to arrive at the intentions and motives of the legislators who proposed or enacted them. No such complicated

political machinery as that used at the present time had ever been attempted, or perchance dreamed of, for years after the two amendments were added to the Constitution. If such an interpretation had been attempted in the reconstruction period, it would have been derided, because those then in power did not desire that the newly enfranchised should ever enter the Democratic, or any other than the Republican Party. However, "time marches on," and the negro had turned from the "lily white" arm of the Republican Party to the Democratic Party, and in construing the primary system it was held that the party was an agency of the state government, and as such under the fostering care of the two amendments.

However much the logic and strength of the minority opinion in the case of Nixon v. Condon, herein cited, may excel those of the majority opinion, however much we may differ with the majority opinion, representing only five of the nine judges of the federal Supreme Court, still it is the law of the land, and this court will endeavor to follow not only its spirit but its letter. That opinion, while holding that the state had made the state executive committee its agent by authorizing them to fix the qualifications of members of the party, still in effect holds that the state had not made the party state convention its agent, and that, if the convention, through its inherent powers, decided who should or should not be members of the party, it would be a valid and binding exercise of power, which had steered clear of the Fourteenth and Fifteenth Amendments. In an attempt to follow the majority opinion in Nixon v. Condon, the state convention of the Democratic Party of Texas in May last, by resolution duly adopted, excluded negroes from Democratic primaries. The convention followed the majority opinion to the letter, and this court follows it in the same manner.

No decision of any appellate court of Texas has ever been written that tends to sustain the decision of the trial court herein, which enjoined the primary election officers of the Democratic Party from obeying the commands of their highest authority in the councils of the party, and which Judge Cardozo holds had power to give the authority destroyed by the district judge.

The case of Briscoe v. Boyle, 286 S. W. 275, delivered by this court, has no applicability to the facts of this case. In that case it was merely held that, the Legislature having passed a law fixing the only test that could be imposed upon a voter by the inscription at the head of the ticket, the officers of the election had no right or authority to exclude a voter because he had voted the Republican ticket at a former election; in other words, election officers have no power

or authority to create new tests not fixed by the governing power of the party.

The case of Love v. Wilcox, 119 Tex. 256, 28 S.W.(2d) 515, 70 A. L. R. 1484, is mainly on the jurisdiction of the Supreme Court, and follows the Briscoe Case in saying that officers of election have no authority to prescribe other qualifications than those prescribed by statute. The two opinions merely held that the statute had prescribed the only tests that could be invoked by the officers of election. The last expression of the Supreme Court in Love v. Buckner (Tex. Sup.) 49 S.W.(2d) 425, if read in consonance with the last expression of the Supreme Court of the United States, sustains the opinion of this court.

We quote from Love v. Buckner as follows: "We do not think it consistent with the history and usages of parties in this state nor with the course of our legislation to regard the respective parties or the state executive committees as denied all power over the party membership, conventions, and primaries, save where such power may be found to have been expressly delegated by statute. On the contrary, the statutes recognize party organizations including the state committees, as the repositories of party power, which the Legislature has sought to control or regulate only so far as was deemed necessary for important governmental ends, such as purity of the ballot and integrity in the ascertainment and fulfillment of the party will as declared by its membership."

In the Nixon v. Condon Case, 286 U. S. 73, 52 S. Ct. 484, 76 L. Ed. 984, the Supreme Court bases the agency of Texas in the governing of political parties on the power given the executive committee to fix the qualifications of membership in the party, but, after destroying the ship of party power and rule, threw out a spar upon which the party might keep its head above the tumultuous political sea of 1932, that spar being the convention of the party, not acting on any state mandate, but on its unfettered volition. The executive committee acquiesced in the resolution of the state convention and certified the resolution of the convention down for the government of the county primaries. The primary of Bexar county endeavored to act under that resolution, but was prevented by the injunction granted by a state district judge.

The only method of protecting its inherent right to state who shall and shall not be members of the Democratic Party in Texas, by the five to four opinion in Nixon v. Condon, has been strictly followed by the party, and the resolution of the May convention of 1932 will be respected and carried into effect by this court.

Our original opinion is upheld as supported by law and precedent.